UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

Carolyn Gallagher; Nicole Porrazzo;
Christan Marquart; Andrea Glubiak;
and Danielle Spegele, on behalf of
themselves and others similarly situated,

　　　　　　　　　　　　　　Plaintiff,

- against -

A&J Aussie Restaurant Group Inc.
and Outback

　　　　　　　　　　　　　　Defendants.

------------------------------------------------------------------X

02-CIV-　　　(　)(　)

**PLAINTIFFS'
COMPLAINT**

**PLAINTIFF DEMANDS
A JURY TRIAL**

　　　　Plaintiff **Carolyn Gallagher; Nicole Porrazzo; Christan Marquart; Andrea**

**Glubick; and Danielle Spegele, on behalf of themselves and others similarly situated,**

(hereinafter **"Gallagher"; "Porrazzo"; "Marquart"; "Glubiak"; and "Spegele"** or

"Plaintiffs") by their attorneys, Solotoff & Solotoff, Esqs., as and for their Complaint

complains of Defendants **A&J Aussie Restaurant Group Inc., and Outback** (hereinafter

**"Aussie/Outback"** or "Defendants") as follows:

## PRELIMINARY STATEMENT

　　　　1.　　Plaintiffs complain that they suffered a sexually hostile work environment and

retaliation, and was otherwise treated differently with respect to the terms, conditions and

privileges of employment because of their sex (female), by reason of such discrimination, in

violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Section 2000e et

seq.; the Civil Rights Act of 1991, (Pub. L. No. 102-166, 105 Stat. 1071); the New York State

Human Rights Law, N.Y. Exec. Law Section 290 et seq., and all applicable rules and

regulations.　Plaintiffs seek declaratory, legal, equitable, and other relief as may be just and

proper under the circumstances.

## JURISDICTION AND VENUE

2.    This Court has jurisdiction to hear and resolve this Complaint by virtue of Title VII of the Civil Rights Act of 1964, as amended, the Civil Rights Act of 1991, (Pub. L. No. 102-166, 105 Stat. 1071); 42 U.S.C. Section 2000e-5(f)(3), the New York State Human Rights Law, N.Y. Exec. Law Section 290 et seq.; and all applicable rules and regulations, and 28 U.S.C. Sections 1331, 1343(a)(4), and under the doctrine of supplemental and pendent jurisdiction.

3.    The venue of this action is proper because the unlawful practices, of which Plaintiff complains, occurred within this district, as required by 42 U.S.C. Section 2000e-5(f)(3) and 28 U.S.C. Section 1391, and Defendant regularly does business within, the Eastern District of New York.

4.    This is an action arising under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Section 2000e, et seq., and the Civil Rights Act of 1991; the New York State Human Rights Law, N.Y. Exec. Law Section 290 et seq.; and all applicable rules and regulations; on principles of supplemental and pendent jurisdiction; and principles of common law.

## PARTIES

5.    At all the relevant time herein, **Gallagher** was, and is, a "female" and a resident of the State of New York, residing at Mattituck, New York.

6.    At all the relevant time herein, Plaintiff **Gallagher** was employed by Outback as a waitress from in or about three years to on or about November 27, 2001 when she was constructively discharged.

7. At all the relevant time herein, **Porrazzo** was a resident of the State of New York, "female," residing at Port Jefferson Station, New York.

8. At all relevant time herein, **Porrazzo** was employed by "**Aussie/Outback**" as a hostess/waitress from on or about August 2000 to in or about December, 2001.

9. At all relevant time herein, **Marquart** was a resident of the State of New York, "female," residing at Middle Island, New York,

10. At all relevant time herein, **Marquart** was employed by "**Aussie/Outback**" as a waitress for approximately three years.

11. At all relevant time herein, **Glubiak** was a resident of the State of New York, "female," residing at Patchogue, New York.

12. At all the relevant time herein, Plaintiff **Glubiak** was employed by "**Aussie/Outback**" as a waitress from on or about November 2000 to on or about December 10, 2001.

12. At all relevant time herein, **Spegele** was a resident of the State of New York, "female," residing at Yaphank, New York.

13. At all relevant time herein, **Spegele** was employed "**Aussie/Outback**" as a waitress from in or about July 2000 to the present.

14. Upon information and belief, A&J Aussie Restaurant Group, Incorporated (hereinafter "Aussie") d/b/a Outback Steakhouse (hereinafter "**Aussie/Outback**") and its corporate affiliates, associates, and other entities owned operated and controlled by Aussie directly and indirectly, with a principal office and place of business located at Port Haven Shopping Center, East Setauket, New York 11733 (631) (474-8700).

3

15.     The Defendants are: **Aussie/Outback,** as herein identified, and on the formal EEOC Charging notice, who were and are at all times herein, responsible personally and individually, as employer, for the acts of its principals, supervisors, directors, agents, and/or co-employees.

16.     At all the relevant time periods herein required the Respondents employed at least 15 or more employees.

17.     Plaintiffs have fulfilled all conditions precedent to the institution of this action, and have filed this Complaint within ninety (90) days from receipt of the "Right-to-Sue" Letters issued from the EEOC dated on or about July 31, 2002 (See attached).  Further, Plaintiff has fulfilled all conditions precedent to the institution of this action with respect to the New York State Department of Human Rights (NYSDHR) and by advising and serving a filed copy of this Complaint in a timely manner.  There are no other adequate remedies at law.

### FACTUAL BACKGROUND

18.     From in or about June 2001, and almost weekly at times prior thereto, and pervasively thereafter, up to November 27, 2001, and thereafter, to in or about January 2002 Defendants Supervisors, aided and abetted co-workers and staff, who berated, embarrassed, and humiliated Plaintiffs as female employees, using vile, obnoxious conduct, and offensive language in relation to sex.

**A.     Examples of Sexual Harassment and Hostile Work Environment and Employee Complaints Pre-November 21, 2001**

19.     At all the relevant time herein, and from time to time, Plaintiffs complained, for example, among other things, as follows:

**(a)     Marquart:**     In August 1999, Pedro trapped her in "walk-in" and attempted to kiss her.  She complained to Tynan.  Nothing was done about it;

4

**(b)**     **Marquart:**     From in or about April 1, 2001 Arsenio, Pedro, Juan, Mario, Carlos, Eddie, and Don leered at her, made comments about her body, and other female body parts, and made her feel uncomfortable and embarrassed;

**(c)**     **Marquart:**     On or about April 1, 2001 Juan, a cook, grabbed her right breast;

**(d)**     **Glubiak:**     In or about May 2001, Porter made sexual comments about her buttocks and grabbed her buttocks when she was bending over at the computer;

**(e)**     **Glubiak:**     In or about May 2001 observed Porter grab Tracy's buttocks. Tracy ran into the bathroom crying;

**(f)**     **Glubiak:**     In or about May-June, 2001, and at times thereafter, Porter said to Nicole, Gallagher and other female employees you're a "fat ass" "Your so ugly" and made fun of female employees' body parts;

**(g)**     **Glubiak:**     Porter would tell her that his tattoo on his shoulder meant "pussy lips" and asked her if she wanted to find out why;

**(h)**     **Glubiak:**     Complained to Tynan prior to November 21, 2001 and no effective action was taken;

**(i)**     **Marquart:**     In or about June, August, September, November, 2001 and January 2002, she observed other female waitresses complain to management (Tynan) about the sexually hostile behavior similar to the hostile behavior that she complained about and experienced;

**(j)**     **Gallagher:**     June 18, 2001 around 10:00 p.m. Arsenio Fernandez glaring, staring and making comments about her body, using hand gestures to describe the size of her backside. He grabbed her buttocks. She observed that it was Arsenio. He said "Big Back." He cornered her and blocked her path. He again grabbed her buttocks and said "Big Back;"

(k)   **Gallagher:**   June 19, 2001 Gallagher complained to Mike Tynan as to what had happened the night before.  Tynan responded that "[he] believes me, but was surprised it was Arsenio."  Nicole told Gallagher she was harassed also and that management did nothing after she complained. She said she had written a letter to the home office and that no one cares. Gallagher was then told that another hostess ran outside crying one night because she was grabbed by Porter in the buttocks;

(l)   **Gallagher:**   June 22, 2001 Tynan told Gallagher that Arsenio denied the allegation and that nothing would be done about it. Tynan did not interview Marquart, Porrazzo, Glubiak, Spegele, or any of the Plaintiffs in an attempt to corroborate Gallagher's claims;

(m)   **Gallagher:**   On or about June 23, 2001 Gallagher told a police officer about Arsenio having grabbed her left buttocks again.  That he blocked her path from being able to get away.  He said "Big Back." She felt threatened.  The officer advised her that she could have him arrested and to press charges;

(n)   **Gallagher:**   On or about June 25, 2001 she spoke with Keith and Tynan about Arsenio's offensive behavior;

(o)   **Gallagher:**   On or about June 26, 2001 she called Ron Duckstein, President LI Outback.  She complained to him about being a victim and that she wanted to be safe at work. He told her that there were other similar instances in the past with other male employees. Marquart told Gallagher about the events that occurred to her concerning Pedro and Juan touching her;

(p)   **Gallagher:**   On or about July 2, 2001 she told Tynan about herself and about the other women.  She named them and described the events that they described to Gallagher.

Gallagher mentioned the other Charging Parties and the sexually degrading events that had occurred. She did not know that at that time Tynan and Keith had received complaints from other women. Tynan and Arsenio denied that anything had occurred. No effective or appropriate action was taken against Arsenio. Arsenio continued to work at the Outback;

(q)     Duckstein and Tynan knew, and had reason to know, that the male staff was harassing the female employees. Although other female employees had complained to Tynan and Keith about sexual harassment in the past, none of the Plaintiffs, or other key witnesses, was interviewed in June or July 2001 either about Gallagher's complaints and observations or about the allegations concerning their abuse. Thereafter, Arsenio stalked Gallagher at work on numerous occasions and stared at her in a menacing manner and gave her the "finger;"

(r)     **Gallagher:**     On or about September 26, 2001 Gallagher filed for an Order of Protection in the First District Court, County of Suffolk, before Honorable Rebolini against Arsenio Fernandez. (See attached Order of Protection and Complaint).     Only after a formal criminal complaint was filed against Arsenio Fernandez and months after she complained, did Tynan fire Arsenio Fernandez;

(s)     **Gallagher:**     On or about November 6, 2001 Ken Sands, a manager, made comments to Gallagher about how the mashed potatoes reminded him about "boobs." Tracie looked embarrassed and Gallagher was surprised;

(t)     **Gallagher:**     On or about November 7, 2001 she complained to management that after Arsenio was fired the male staff was more hostile towards her. For example, Ken called her a "mother fucker." John put Tabasco sauce in her cheese fries. She got ugly looks from the male staff. Andy said something about trying to poison her cheese fries and that she should taste it;

(u)   **Gallagher:**   On or about November 19, 2001 she complained to Tynan again. He tried to make it all her fault and accused her of harassing others. He said "the employees did not have to behave like Ambassadors in the kitchen." She complained that she witnessed two male employees (Mario and Eddie) standing behind two female employees staring at their bodies and commenting and making hand gestures that showed they were trying to size up their body parts. She told him that she finds that disgusting. She told him that when she reports these things to him that nothing is done about it. Thereafter, Carlos ignored Gallagher's requests from the kitchen;

(v)   **Gallagher:**   On or about November 20, 2001 the male staff was giving her dirty looks. Her customer's deserts weren't being made. She was deliberately put on bad stations again and again.

(w)   **Spegele:**   Prior to September 2001 Porter and she got into a yelling match. Porter had made lewd sexual comments towards her. Chris Liebrock (a manager) witnessed this. Mike Tynan was in the kitchen at the time. Management did not effectively or appropriately stop Porter from Porter's offensive conduct. Moreover, she saw how other sexual harassment complaints were handled by management and was reluctant to complain any further. She noticed Chris and Tynan did not do anything about what they observed and felt that complaining would be futile;

(x)   **Porazzo:**   Prior to or in or about February 2001 Tracy Teiken was crying about how Porter grabbed her "ass." Porazzo complained to Kim Haggerty about the incident she had witnessed and that Tracy was upset in the bathroom. There were no interview notes of the Porter incident. Porazzo complained to Keith while she, Porazzo was outside crying.

8

Keith remarked "Oh Porter again" and shrugged his shoulders. They did not follow up with Porazzo;

(y)   **Porazzo:**   Prior to November 21, 2001 and thereafter, food was thrown at the waitresses, almost daily.  Tynan and Keith were present in the kitchen when these things happened.  No effective action was taken.

**B.**   **Examples of Sexual Harassment, Hostile Work Environment, Retaliation and Retaliation Harassment Following Complaints Post-November 21, 2001.**

(a)   **Glubiak:**   On or about November 21, 2001 at the interview with Tynan [Kieth was there], no women were present.  She was made to stand while they sat. They took no notes. They told her that they received a letter from an attorney.  They asked her to explain her complaints.  The interview took five minutes.  They shook their heads, threw up their hands, and rolled their eyes. None of the employees that she complained of were terminated and no effective action was taken;

(b)   **Glubiak**   **Glubiak** told management of other events that she witnessed: For example, Porter sexually harassing Danielle, Porter grabbing Tracy's buttocks, Eddie and other cooks making "cat-calls", Arsenio's actions towards Gallagher confirming Gallagher's complaints, she complained about French Fires being thrown down her blouse, Carlo's touching her offensively, Carlos' vulgar comments to Danielle, cooks speaking "dirty" to the women.  She told them that she had been retaliated against in the past for complaining.  She confirmed the complaints of the other women;

(c)   **Glubiak:**   In or about November 2001 and daily to December 2001, Carlos made comments to women and to her about their "ass", looked and stared at their and her

"breasts", pressed his groin area against her buttocks, whispering in her ear "little momasita," tried to hug her and asking her for a kiss.  Carlos remained employed at Outback;

    **(d)**    **Glubiak:**    On or about November 24, 2001 she began to experience a backlash.  Management assigned her bad "stations" and shifts.  The male employees Mario, Eddie, Juan, and Carlos ignored her, refused to fill her orders.  This was observed by management.  No action was taken;

    **(e)**    **Glubiak:**    After November 21, 2001 and up to the date of her terminating her employment December 10, 2001, Sergio and Pedro continued to make comments such as, "Hey Baby" whistling, leering, "kissy" faces, and lewd remarks and stares. She witnessed Mario, Pedro, Eddie, many times, look down females' blouses, and brush into the female waitress's buttocks, drop things on the floor and force women to bend over to get a better look, or rush into them to touch their breasts;

    **(f)**    **Glubiak:**    Complained to management a number of times, she made suggestions on how to address the problem.  She complained to Tynan that the male staff tried to throw French Fries down her blouse.  He took no action to stop it.  No male employee was properly or effectively stopped from their behavior.  She knew that many other women complained.  The male employees remained employed.  She complained to upper management by telephone and in person;

    **(g)**    **Glubiak:**    Was interviewed by Kim (Hanson) Haggerty.  Tracy Leiken gave a statement about sexual harassment.  Tracy's statement referred to her witnessing Glubiak being harassed by the male staff;

    **(h)**    **Glubiak:**    After Gallgher complained about Arsenio giving her the "finger" for complaining to management, the kitchen staff would not (refused) to make her customer's

salads. She went behind the counter to make it herself. Carlos threw his hands up yelling "policia!" "policia!" mocking the fact that she had complained about their offensive actions. She complained to management (Kim) about the lack of the company's response to their complaints. They sent her out to "calm down;"

      **(i)**    **Glubiak:**    Carlos always asked her to hug and kiss him. She rejected his advances. He would put his arms and hands around her anyway, calling her "mamasita." Carlos remained employed;

      **(j)**    **Glubiak:**    On or about and after November 21, 2001 and after her having met with Tynan, she started to receive stations that had a maximum of 8 customers as opposed to the stations that could hold 14-16 customers. She stopped getting closing shifts. The schedule and the stations she received affected her work and income severely, and so much so, that she had to get a second job;

      **(k)**    **Glubiak:**    On or about November 21, 2001 and thereafter, the cooks would refuse to acknowledge her requests for food for her tables, her customer's dinners began to come out incorrectly or they would take a very long time to be prepared. This affected her tips and the level of her customer satisfaction;

      **(l)**    **Glubiak:**    On or about November 21, 2001 and after meeting with Tynan, the cooks began to make mocking comments such as, "you can't say that now," or "hey, watch what you are saying around certain people" or "I don't think that's appropriate," all in a mocking way, and all directed at her;

      **(m)**    **Glubiak:**    Considered the work environment openly sexually charged readily apparent to her and other female employees;

(n)   **Gallagher:**   On or about November 24, 2001 she was given the worst sections deliberately.

(o)   **Gallagher:**   On or about November 27, 2001 she was again called into Tynan's office and Ken was present.  He accused Gallagher of badgering other employees.  He threatened her stating that he would fire her.  She complained that she couldn't work under threats.  He said he had to let her go.  She told him that since she complained to him, matters have gotten worse for her and that matters were escalating. He did not confirm to her that the other witnesses came forward to corroborate her claims.  She complained that it was not very fair to be threatened by management and that she could not work under these conditions [given that they knew of the harassment from others].  She left the office and immediately returned and told him that the working conditions had become intolerable and that she was leaving under the circumstances;

(p)   Thereafter, Gallagher complained by phone to Ron Duckstein, President LI Outback that she could not work under such threats.  He said several employees complained about her.   He did not confirm for her that many women had complained about sexual harassment and corroborated her allegations.  He was trying to get her to stop talking to the other women who also complained about sexual harassment.  The company actively tried to put a lid on the matter.  They did not effectively or appropriately respond to the numerous complaints.  Instead, she was constructively discharged on November 27, 2001;

(q)   **Marquart:**   On or about November 21, 2001 Tynan interviewed her.  He took no notes of the meeting at the time.  She confirmed that she experienced offensive conduct and reminded him that she had told him in the past;

**(r)     Spegele:**     On or about November 23, 2001 Tynan and Keith called Daniele Spegele into his office.  He did not take notes at the meeting.   Keith and Tynan were seated and she was made to stand.  The meeting was incredibly intimidating.  She told Tynan that the cooks had said things to her, such as "ass", "tits" "pretty hot" and made it obvious what was happening.   The copy of the Spanish Sexual Harassment Policy was not posted in the restaurant;

**(s)     Spegele:**     After November 23, 2001 she began to receive "bad" shifts and stations.  She began to cut back her hours because she felt uncomfortable to work.  She was ignored.  When she requested items from the kitchen staff, her requests for side orders and salad dressing was often ignored;

**(t)     Spegele:**     After November 23, 2001 Mario, Eddie, Juan, and Carlos continued to make sexual comments whistling sounds, leering, kissy faces, and lewd stares.  They remained employed at Outback.  Their conduct continued despite all the complaints that management received.  Management did not effectively or appropriately take action to prevent, stop, or cure the hostile work environment;

**(u)     Spegele:**     In or about November and December 2001, Mario, Pedro and Eddie looked down female's blouses, or forced them to bend over to get a better look down their blouse;

**(v)     Porazzo:**     On or about November 21, 2001 Tynan and Kieth called her into the office.  This was more of an interrogation rather than an interview.  Tynan told her that he allows his children to come to the restaurant and that it is his home and that he feels safe there.  He asked her why she felt uncomfortable.  She explained to him that back in February 2001 she told two managers [Keith and Kim Hanson] about Porter's sexual conduct towards her.

She reminded them that Porter made comments about her, "look at her ass." She experienced constant comments of whistles, looks, kissing faces, and "look at her ass" comments. She told them that she had to take steps to defend herself. She told them that nothing was effectively done about her reporting these incidents in the past. She told them that on November 3, 2001 Carlos' comment "Hey honey do you know your ass looks great in those pants." He stared at her buttocks and chest;

(w)   **Porazzo:**   On or about November 24, 2001 Tynan began to treat her in a "weird" manner. He would not look at her. The staff refused to fill her salad orders and when she yelled and complained they laughed. She told Tynan that she was angry with the way staff was treating her. He complained to her that he did not see the need to yell. He did nothing about the staff mistreating her or refusing to fill her orders;

(x)   **Porazzo:**   After November 21, 2001 she suffered retaliation and harassment. The male staff made fun of her complaining to management about the sexual harassment. Tynan rarely spoke to her after the complaint;

19.   At all the relevant time herein, and upon information and belief, none of the Defendants' employees were ever trained in the alleged Outback Anti-Sexual Harassment and Anti-Harassment Policies. The Spanish transliteration Copy of the Policy was non-existent at the restaurant. Moreover, Outback's policies lack the essential elements of a proper and effective policy.

20.   At all the relevant times herein, the interviews conducted by management were intimidating and humiliating and added to the harassment and the Plaintiffs' fears that management would not treat their complaints in an appropriate or effective manner.

21.    The Plaintiff, Gallagher sought an Order of Protection against Arsenio Fernandez. (See formal complaint filed September 26, 2001 annexed hereto). Only after she filed such a proceeding did management take action to fire him. All the remaining employees were not effectively disciplined or trained before, during, or after November 21, 2001. Nevertheless, and despite managements' stated Response Submitted, sexually and retaliatory harassing conduct continued against the remaining employed Charging Parties well into 2002.

22.    At all the relevant times herein, additional female employees, Tracy Leiken, Jaclyn Rizzo, Kristina Prohobiak have written statements corroborating the allegations of the Plaintiffs.

23.    Upon information and belief, the **Aussie/Outback** had been sued in the past for discriminatory conduct. The outcome resulted in a multimillion dollar recovery for the Plaintiff in that case.   On or about November 21, 2001 Gallagher brought the events in this matter to the attention of Ron Duckstein, President of LI Outback. Nevertheless, no effective or appropriate action was taken. Gallagher was forced to be discharged on November 27, 2001. Other Plaintiffs also left employment at the E. Setaucket Outback.

24.    At or about November 21, 2001, a letter was mailed to Mike Tynan, on behalf of Plaintiffs, wherein it was demanded:

>    **"Pending a final resolution of this matter, if any, *demand is hereby made that the company take every reasonable step to stop the sexual harassment and the hostile work environment... prevent the continuation of said conduct, and protect them from retaliation for complaining."***

25.    At all the relevant time herein, **Aussie/Outback** violated the Plaintiffs' rights as protected by the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e *et seq.*  The employer, is obligated by federal, state and local statutory law to ensure, prevent, protect and

correct any acts of sex discrimination and sexual harassment against female employees in the work place.

26.     At all the relevant time herein, the hostile or abusive work environment was created and carried on by non-supervisory fellow workers of the Plaintiffs, the Employer, is responsible and/or liable for permitting such behavior.  The supervisors or successively higher authorities knew (that is, had actual knowledge), or should have known (that is, had constructive knowledge), of the hostile or abusive work environment *and* permitted it to continue by failing to take remedial action to prevent its reoccurrence, to protect the employee(s), or to stop it.

27.     The Aussie/Outback supervisors had constructive knowledge of a hostile or abusive work environment when the hostile or abusive environment was so pervasive and so open and obvious that any reasonable person in the supervisor's position would have known that the harassment was occurring.

28.     At all the relevant time herein, the supervisor(s) had actual knowledge.  In this matter the highest ranking officers and immediate supervisors had actual and constructive knowledge of the hostile work environment.

29.  From in or about, and prior to November 2001, and almost weekly at times prior thereto, and pervasively thereafter, through January 2002, and up to the present, said managers, co-workers and staff, berated, embarrassed, and humiliated Plaintiffs as female employee, using vile, obnoxious conduct, and offensive language in relation to sex.

30.     On numerous occasions upper management had the opportunity to exercise its powers to discipline offending personnel, instead it maliciously, and in a gross and reckless and indifferent manner failed to effectively prevent, protect or stop the derogatory and sexually

hostile, offensive and suggestive conduct, behavior, remarks and comments that were directed at the Plaintiff, or about her to others, made in her presence, and known by management.

31.     Plaintiffs' employer was on notice that its policies, training programs, and investigations, and response to Plaintiff's complaints were ignored, a sham, for show purposes only, woeful, ineffective, not timely, and/or otherwise inappropriate.  No meaningful action was ever taken by management despite the nature of the continuing harassing and offensive and retaliatory conduct.  Management aided and abetted, condoned, and tolerated said conduct.

32.     The offending conduct continued over Plaintiffs' attempts to protest and complain.

33.     At all the relevant time, and given the totality of the circumstances, the conduct of British Airways constituted malice, gross negligence, and gross and reckless indifference, and retaliatory harassment the effect of which effectively condoned, tolerated and permitted the continuing hostile work environment and retaliation.

34.     The offensive conduct and behavior continued pervasively, continuously and over Plaintiffs' objections and attempts to stop said conduct. The offending supervisors and co-workers made unwelcome and uninvited sexual acts, and abusive remarks about sex acts, sexual desires, and what they would like to do sexually and with other women. Their conduct made Plaintiff's life at home and at work extremely difficult.

35.     Despite Plaintiffs' complaints, their employer took absolutely no effective or appropriate action to stop the sexual hostility and discrimination and retaliation that Plaintiffs was experiencing.  Management failed to provide adequate training and supervision to assure that "sexual harassment," and/or "retaliation" in the work place, would, and did not occur. Moreover, although Management was aware of the illegal conduct towards Plaintiffs, they

17

refused, failed, and otherwise took no effective action to prevent, protect, and assure that sexual harassment and retaliation would not occur in context of the work place. Management was, and is, also guilty of malice and a reckless disregard of the federal, state, and local laws prohibiting sex discrimination and retaliation in the work place. As a direct result, the company should be absolutely liable for compensatory, pecuniary, non-pecuniary, and punitive damages.

36. Together, the Defendants continued a pattern and practice relating to Plaintiffs, creating a sexually "hostile work environment," and retaliatory harassing conduct constituting sexual discrimination, intimidation, harassment, and an offensive working environment, and retaliation adversely affecting her ability to perform her duties and causing her to suffer physical injury, emotional distress, anxiety, pain and depression.

37. Plaintiffs were made to feel humiliated and worthless by reason of their employer's failure to respond to the numerous complaints to the highest levels of management, by failing to timely and effectively investigate their complaints, and failing to prevent and protect them from sexually offensive conduct of managers and co-workers. Plaintiffs sought safety, and the same terms, conditions, privileges and benefits that other employees enjoyed and relief from the hostile work environment and retaliation. Plaintiffs were denied such relief.

38. Plaintiffs suffered retaliation and loss of tangible job benefits and retaliation harassment. Indeed, the more Plaintiffs complained and the worse the sexually offensive conduct continued, the worse the retaliatory conduct became. The male employees made fun of their complaining. They mocked managements' policies, and they directed their hostility towards the Plaintiffs. Management also directed its hostility towards the Plaintiffs and targeted them for abusive conduct and a retaliatory hostile work environment. Managements'

reaction and the intensity and the greater frequency of the offensive conduct, and managements' failure to take any effective and immediate and appropriate action, heightened Plaintiffs' sense of fear and anxiety over the hostility, and the consequences of their complaining to them about it and their refusal to stop it.

39. At the time of these events Plaintiffs suffered physical injury, anxiety, upset, stress, embarrassment, humiliation, fear, and health problems due to the discriminatory conduct and hostile work environment    Aussie/Outback is guilty for its actions, and inactions, malice, disregard, and gross and reckless indifference to her pleas for protection all of which caused her great pain and suffering.

**AS AND FOR A FIRST CAUSE OF ACTION**
**(VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED)**

40. Plaintiffs repeat and reallege each and every allegation made in Paragraphs 1 through 39 of this Complaint with the same force and effect as separately stated and alleged hereat.

41. This action is brought against the Defendants for its violation of Title VII (Title VII) of the Civil Rights Act of 1964, as amended, 42 U.S.C. Sec.2000e et seq., and for equitable and legal relief pursuant to Title VII, 42 U.S.C. Sec.2000e et seq., and the Civil Rights Act of 1991 (Nov. 21, 1991), 42 U.S.C. Sec.1981-A (CRA 1991) for sex discrimination in the employment context.

42. From in or about November 2001, with increasing intensity thereafter, through to the present, Defendant created, encouraged, permitted and condoned a continuing, pervasive, and seriously abusive sexually hostile environment at work and did engage in unlawful sexual harassment, and sex discrimination against Plaintiffs in violation of the Civil Rights Act of 1964, as amended, Title VII, 42 U.S.C. Section 2000e et seq., the Civil Rights

19

Act of 1991, and more particularly, Section 2000e-2(a) and appropriate federal regulations, and more particularly, 29 CFR Section 1604 et seq.

43.     Plaintiffs bring this action for having been adversely affected by the Aussie/Outback ineptitude, gross negligence, malice, and gross and reckless indifference and lack of policies and practices as complained of herein.

44.     As a direct and proximate result of Defendants' discriminatory actions against the Plaintiff, in violation of Title VII as aforesaid, the Plaintiffs should be awarded compensatory damages, and punitive damages, back pay, front pay, lost benefits, pecuniary loss, humiliation, embarrassment, emotional pain, suffering, inconvenience, mental anguish, loss of employment of life, future pecuniary loss, pre-judgment interest, and post judgment interest and other non-pecuniary losses, and exemplary and punitive damages in an amount that a jury may deem appropriate, in addition to attorney's fees, and the costs and expenses of this action.

<h3 style="text-align:center">AS AND FOR A SECOND CAUSE OF ACTION<br>(FOR VIOLATION OF THE NEW YORK STATE HUMAN RIGHTS LAW)</h3>

45.     Plaintiffs repeat, reiterate and reallege each and every allegation in Paragraphs numbered "1" through "44" as if herein at length more fully set forth with the same force or effect below. As a direct and proximate result of the aforementioned sexual harassment, the Plaintiffs were caused to suffer emotional pain, suffering, inconvenience, and mental anguish, loss of enjoyment of life, pecuniary loss, future pecuniary loss, and other non-pecuniary losses.

46.     As a direct and proximate result of Defendants' discriminatory actions against the Plaintiffs, in violation of New York State Executive Law, Section 290 et seq., (NYSHRL) as aforesaid, the Plaintiffs should be awarded compensatory damages, and punitive damages,

20

back pay, front pay, lost benefits, pecuniary loss, humiliation, embarrassment, emotional pain, suffering, inconvenience, mental anguish, loss of employment of life, future pecuniary loss, pre-judgment interest, and post judgment interest and other non-pecuniary losses in an amount that a jury may deem appropriate, in addition to attorney's fees, and the costs and expenses of this action.

**AS AND FOR A THIRD CAUSE OF ACTION**
**(VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED)**
**FOR RETALIATION AND RETALIATION HARASSMENT**
**ADVERSELY AFFECTING PLAINTIFFS'**
**TERMS AND CONDITIONS OF EMPLOYMENT**

47.     Plaintiffs repeat and reallege each and every allegation made in Paragraphs 1 through 46 of this Complaint with the same force and effect as separately stated and alleged hereat.

48.     This action is brought against the Defendants for its violation of Title VII (Title VII) of the Civil Rights Act of 1964, as amended, 42 U.S.C. Sec.2000e et seq., and for equitable and legal relief pursuant to Title VII, 42 U.S.C. Sec.2000e et seq., and the Civil Rights Act of 1991 (Nov. 21, 1991), 42 U.S.C. Sec.1981-A (CRA 1991) for retaliation and retaliation harassment in the employment context.

49.     From in or about, and prior to November 2001, with increasing intensity thereafter, through to the present, Defendants created, encouraged, permitted and condoned a continuing, pervasive, and seriously abusive sexually hostile environment at work and did engage in unlawful retaliation and retaliation harassment against Plaintiff in violation of the Civil Rights Act of 1964, as amended, Title VII, 42 U.S.C. Section 2000e et seq., the Civil Rights Act of 1991, and more particularly, Section 2000e-2(a) and appropriate federal regulations, and more particularly, 29 CFR Section 1604 et seq.

21

50.    Plaintiffs bring this action for having been adversely affected by the Aussie/Outback ineptitude, gross negligence, malice, and gross and reckless indifference and lack of policies and practices as complained of herein.

51.    As a direct and proximate result of Defendants' discriminatory actions and retaliation against the Plaintiffs, in violation of Title VII as aforesaid, the Plaintiffs should be awarded compensatory damages, and punitive damages, back pay, front pay, lost benefits, pecuniary loss, humiliation, embarrassment, emotional pain, suffering, inconvenience, mental anguish, loss of employment of life, future pecuniary loss, pre-judgment interest, and post judgment interest and other non-pecuniary losses, and exemplary and punitive damages in an amount that a jury may deem appropriate, in addition to attorney's fees, and the costs and expenses of this action.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**(FOR VIOLATION OF THE NEW YORK STATE HUMAN RIGHTS LAW)**
**FOR RETALIATION AND RETALIATION HARASSMENT**
**ADVERSELY AFFECTING PLAINTIFFS'**
**TERMS AND CONDITIONS OF EMPLOYMENT**

52.    Plaintiffs repeat, reiterate and reallege each and every allegation in Paragraphs numbered "1" through "51" as if herein at length more fully set forth with the same force or effect below. As a direct and proximate result of the aforementioned retaliation and retaliation harassment, the Plaintiffs was caused to suffer emotional pain, suffering, inconvenience, and mental anguish, loss of enjoyment of life, pecuniary loss, future pecuniary loss, and other non-pecuniary losses.

53.    As a direct and proximate result of Defendants' discriminatory actions and retaliation against the Plaintiffs, in violation of New York State Executive Law, Section 290 et seq., (NYSHRL) as aforesaid, the Plaintiffs should be awarded compensatory damages, and

22

punitive damages, back pay, front pay, lost benefits, pecuniary loss, humiliation, embarrassment, emotional pain, suffering, inconvenience, mental anguish, loss of employment of life, future pecuniary loss, pre-judgment interest, and post judgment interest and other non-pecuniary losses in an amount that a jury may deem appropriate, in addition to attorney's fees, and the costs and expenses of this action.

### AS AND FOR PLAINTIFFS' FIFTH CAUSE OF ACTION
### (GROSS, WILLFUL, WANTON, MALICE, GROSS CARELESSNESS, RECKLESSNESS, AND DEPRAVED INDIFFERENCE IN VIOLATION OF PLAINTIFF'S FEDERAL AND STATE CIVIL RIGHTS )

54.     Plaintiffs repeat and reallege each and every allegation made in Paragraphs numbered 1 through 53 of this Complaint with the same force and effect as separately stated and alleged hereat.

55.     The aforementioned occurrences and violation of Plaintiffs' federal, and  state statutory rights as aforesaid, was caused by reason of the gross, willful and wanton, malice, and gross carelessness, recklessness, and/or depraved indifference of the Defendants, their agents, servants, and/or employees in the ownership, operation, management, security and control of the aforementioned premises.

56.     At the aforementioned time and place, and as a direct and proximate result of defendants' gross, willful and wanton, malice, and gross carelessness, recklessness, and/or depraved indifference in violation of Plaintiffs' statutory rights as aforesaid, the Plaintiff was severely injured and damaged and did suffer nightmares, physical and severe emotional pain, strong and continuing concerns regarding her privacy and security, shock and fright, anxiety, mental stress, humiliation, embarrassment, and loss of enjoyment of life, cost and expense.

57.     As a further proximate result of sustaining the above injuries and of the gross, willful and wanton, carelessness, recklessness, and/or depraved indifference by the Defendants as aforesaid, Plaintiffs were compelled to expend the costs of treatment and care.

58.     As a result of all the foregoing, Plaintiffs were damaged in the amount such as a jury may award, and is further entitled to recover pecuniary, non-pecuniary damages, lost pre and post judgment interest, attorneys' fees, exemplary and punitive damages, and the costs and disbursements of this action.

**WHEREFORE**, Plaintiffs hereby demand a trial by jury and prays for the following legal and equitable remedies:

A.     Plaintiffs should be awarded back pay, with interest, compensatory and punitive damages.  Said damages to include but not to be limited to: front pay, lost benefits, pecuniary loss, humiliation, embarrassment, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, future pecuniary loss, and non-pecuniary losses, pre-judgment interest, exemplary damages; and

B.     Reasonable attorney's fees; and

C.     Costs, disbursements, and expenses of this action;

D.     Declaratory judgment and other equitable relief;

E.     Such other further legal and equitable relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action.

Respectfully submitted,
SOLOTOFF & SOLOTOFF
P.O. Box 4686

Great Neck, New York 11023

By _____

Lawrence Solotoff (LS1306)

(Plaintiffs' Trial Counsel)